UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NISKAYUNA OPERATING CO., LLC,  :

                    Plaintiff,  :      \_\_\_\_\_ Civ._____

    -against-  :

KATHLEEN SEBELIUS, as Secretary of the United States  :   AFFIDAVIT IN SUPPORT
Department of Health and Human Services, DONALD          OF TEMPORARY
BERWICK, as Administrator of the Centers for Medicare  :   RESTRAINING ORDER
& Medicaid Services, and RICHARD F. DAINES, M.D.,         AND MOTION FOR
as Commissioner of Health of the State of New York,   :   <u>PRELIMINARY INJUNCTION</u>

                   Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK      )
                              ) *ss:*
COUNTY OF SCHENECTADY  )

      MATHEW VARGHESE, being duly sworn, says:

      1.     I am the administrator of the skilled nursing facility (the "Facility") now known as Pathways Nursing and Rehabilitation Center, owned and operated by plaintiff Niskayuna Operating Co., LLC ("Niskayuna") located at 1805 Providence Avenue, Niskayuna, NY.

### INTRODUCTION

      2.     Niskayuna is facing the imminent risk of losing its Medicare provider agreement[1] and as a result having to shut its doors forever (after having purchased the Facility and operated it for only seven weeks) without ever having had the opportunity to be heard on the propriety of the New

---

[1] While we have, to date, only received notice of termination of the Medicare provider agreement, once that is terminated, we expect to receive notice that our Medicaid provider agreement is being terminated as well.

Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP
1111 Marcus Avenue, Suite 107
Lake Success, NY 11042

York State Department of Health ("DOH")'s recommendation to the Centers for Medicare & Medicaid Services ("CMS") and CMS's decision to terminate Niskayuna's Medicare provider agreement.

3. Such closure would force the relocation of over 100 residents of the Facility, including 24 ventilator dependent residents, 16 of whom are children.

4. The closure would have untold impact on our work force of 237 persons.

5. As discussed in the accompanying memorandum of law, defendants' conduct violates Niskayuna's procedural due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and the Social Security Act. A copy of Niskayuna's Complaint is annexed as Exhibit A.

#### DEFENDANTS ARE TRAMPLING ON NISKAYUNA'S RIGHTS

6. The Facility has qualified to receive payments under Medicare, having been certified as meeting the participation requirements of the Medicare program.

7. DOH conducts onsite monitoring of skilled nursing facilities such as the Facility, to verify that they continue to be in substantial compliance with these requirements.

8. From May 5-11, 2010 (when the Facility was still under the prior ownership), DOH conducted a survey of the Facility, then known as Northwoods Rehabilitation and Extended Care Center at Hilltop. (In or about July 2007, when the Facility was still under prior ownership, DOH had designated the Facility as a special focus facility because it had had more problems and more serious problems than most other facilities and a pattern of serious problems that persisted over a long period time).

9. The survey team leader was George Shaw ("Shaw"), a former employee of the Facility, whose employment had ended on April 18, 2008.

10. As a result of the survey, DOH issued a statement of deficiencies to the Facility on May 25, 2010. The Statement of Deficiencies included multiple D, E and F deficiencies (meaning DOH found no actual harm to residents, but with potential for more than minimal harm) and one G level deficiency (actual harm that did not rise to the level of immediate jeopardy).

11. The Facility submitted a Plan of Correction accepted by DOH on June 17, 2010. A copy of the DOH letter accepting the Plan of Correction and the Statement of Deficiencies with the Plan of Correction are annexed together as Exhibit B.

12. From July 19-21, 2010, DOH revisited the Facility for the first time to assess whether the Facility had implemented the Plan of Correction and achieved substantial compliance with the Medicare participation requirements. After the conclusion of this revisit, DOH issued another Statement of Deficiencies on August 9, 2010, which included D and G deficiencies.

13. The Facility submitted another Plan of Correction, dated August 18, 2010, accepted by DOH on August 19, 2010. A copy of the DOH letter accepting the Plan of Correction and the Statement of Deficiencies with the Plan of Correction are annexed together as Exhibit C.

14. In the midst of all these surveys, revisits and reports, on August 30, 2010, Niskayuna closed on the purchase of its assets of the Facility and began operating the Facility as Pathway Rehabilitation & Specialty Care Center. By that time, the Facility had been a special focus facility for 37 months, an unusually long period of time in my experience.

15. From September 20-October 1, 2010, DOH revisited the Facility for the second time and issued yet a third Statement of Deficiencies on October 5, 2010. This time, the Facility had

made considerable improvement, in that the Statement of Deficiencies only noted three D or E deficiencies and no harm level.

16. Niskayuna submitted a Plan of Correction, dated October 6, 2010, accepted by DOH on October 7, 2010. A copy of the DOH letter accepting the Plan of Correction and the Statement of Deficiencies with the Plan of Correction are annexed together as Exhibit D.

17. On October 15, 2010, DOH began its third revisit of the Facility, we assumed to determine whether the Facility had implemented the October 6, 2010 Plan of Correction and achieved substantial compliance.

18. But, in the midst of the revisit, on October 19, 2010, only seven weeks after Niskayuna had closed on the purchase of the Facility and despite the fact that the Facility had made considerable progress in correcting its deficiencies under the new ownership, CMS sent Niskayuna a Notice of Termination of its Medicare provider agreement apparently based on recommendations from DOH. The Notice of Termination (copy annexed as Exhibit E) states in pertinent part:

> After careful review of the DOH's findings and recommendations, CMS has determined that your facility's **Medicare provider agreement will terminate on <u>November 11, 2010.</u> In addition a Mandatory Denial of Payment for New Medicare/Medicaid Admissions will be effective November 3, 2010 in accordance with 42 CFR 488.417(b)**.
>
> . . .
>
> DOH will ask you to submit a closure plan to facilitate the safe transfer of facility residents.
>
> CMS is required to provide the general public with notice of an impending termination. We will publish a public notice of the termination in The Daily Gazette on <u>October 27, 2010.</u>

> If you disagree with this determination, you or your legal representative may request a hearing before an Administrative Law Judge of the Department of Health and Human Services, Departmental Appeals Board. Procedures governing this process are set out in 42 CFR 498.40, et seq. A written request for a hearing must be filed no later than 60 days from the date of receipt of this letter.
>
> . . .
>
> . . . A request for a hearing should identify the specific issues, and the findings of fact and conclusions of law with which you disagree.

Emphasis added.

19. I was taken aback by the letter. DOH had not completed the revisit. We had not been given any feedback from DOH, formal or informal, oral or written about the Facility's compliance, let alone a statement of deficiencies. The statement of deficiencies must be submitted in conjunction with the request for an informal dispute resolution proceeding with the state. As soon as we receive a statement of deficiencies and can formulate a plan of correction we intend to do so and then request a state informal dispute resolution proceeding.

20. We are filing today a request for an expedited hearing before an Administrative Law Judge of the United States Department of Health and Human Services, Departmental Appeals Board ("DAB"). A copy of the request is annexed as Exhibit F.

21. Perhaps most disturbing, though, is that *even though we have filed this request, we will not actually be able to have a hearing before Niskayuna's Medicare provider agreement is terminated effective November 11, 2010*.

22. Then, on October 21, 2010, two days *after* we received the Notice of Termination, I received a telephone call from Shaw (the survey team leader and former Facility employee)

advising that he was conducting an exit conference by telephone. Again, I had no warning he was going to call, no opportunity to gather my staff (including the Director of Nursing) to be able to respond to anything he might raise. During the telephone exit conference, Shaw only advised me that Niskayuna was going to be cited with two deficiencies arising from the same incident – the generic "quality of care" and "unnecessary medication" – but he did not provide me with any other details, not even the scope or severity of the deficiencies.

### NISKAYUNA FACES IMMEDIATE AND IRREPARABLE HARM

23. DOH is effectively preventing Niskayuna from coming into substantial compliance with the Medicare participation requirements and avoiding termination of its Medicare provider agreement. Moreover, *Niskayuna faces the very real and imminent threat of losing its provider agreement without a hearing.*

24. Not only that, but CMS is going to start publicizing the impending termination of Niskayuna's provider agreement on *October 27, 2010, two days from the submission of this affidavit*. The Notice of Termination (Ex. E) advises us that "We will publish a public notice of the termination in The Daily Gazette on October 27, 2010."

25. Once this notice is published in the local community, Niskayuna will stop receiving admissions and staff will start seeking alternative employment and leaving. Even if we were ultimately to prevail at a hearing, or even on this motion for a preliminary injunction, it would be too late to reverse the chain reaction such a public notice would trigger. No one will want to send an elderly or infirm loved one to, or work at, a facility they think is closing.

26. The risk of losing, in particular, our specially trained nursing staff who care for our pediatric ventilator residents and traumatic brain injury residents would be devastating. These specialized personnel would be particularly difficult to replace.

27. Termination of Niskayuna's provider agreement, even if Niskayuna were subsequently to prevail at a hearing it might eventually obtain, would result in Niskayuna losing nearly all of its revenue and shutting its doors. This result would be all the more devastating inasmuch as the Facility's new ownership has only been operating the Facility for seven weeks and has already made great strides in curing deficiencies and nearing, if not obtaining, substantial compliance.[2]

28. 81.5% of the Facility's gross revenue comes from participation in the Medicaid or Medicare programs. Termination of the Medicare provider agreement would likely lead to the closure of the Facility, which would wipe out the company.

29. Obviously, if Niskayuna were forced to close the Facility for lack of revenue and new admissions, it would have to make alternate arrangements for its current residents. As of October 22, 2010, 107 of Niskayuna's Facility 110 beds are filled (97%), including 34 pediatric residents (16 of whom are ventilator-dependent), seven adult ventilator-dependent residents, 28 traumatic brain injury adults and 38 elderly residents who require rehabilitation.. Moving any of our elderly, frail, infirm and vulnerable residents, particularly our vent residents, would likely cause them transfer

---

[2] One has to wonder why DOH approved the sale of the Facility and permitted it to close in August 2010if it was so close to recommending termination of the Facility's Medicare provider agreement. I understand that the closing of the sale enabled DOH to receive approximately $6,210,000 of an approximately $8,400,000 indebtedness of the prior owner to DOH for cash receipts assessments, interest and penalties. A copy of a Stipulation and Order resolving claims by and against DOH entered in a chapter 11 bankruptcy proceeding of the former owner of the Facility revealing this agreement is annexed as Exhibit G. Could it be that DOH wanted to be assured it would be repaid this substantial part of the prior owner's indebtedness?

trauma, increasing the possibility of serious illness or even death. Our residents' associational interests such as friendships among themselves and our staff will also likely be disrupted if they are scattered among other facilities.

30. This trauma is not limited to the residents. The burden is likely to fall on family members to locate a suitable alternate facility for their loved ones.

31. Moreover, Niskayuna employs 237 persons, including certified nursing assistants, licensed practical nurses, registered nurses, dietary personnel, rehabilitation staff, respiratory therapists, housekeeping workers, maintenance, administrative staff and others. A list of our employees is annexed as Exhibit G. In this fragile economic climate, particularly in upstate New York, Niskayuna's closure would have devastating repercussions on these persons, as well.

32. Even if Niskayuna is ultimately successful on its appeals, once the residents and employees are gone, they will not likely want to move back to Niskayuna.

33. Termination of Niskayuna's Medicare provider agreement would also be interpreted by the community as a drastic, punitive action that must have been deserved because of some extreme or dangerous condition at the Facility. This damage to Niskayuna's reputation would likely be irreversible.

34. In sum, if defendants are permitted to publish the termination of Niskayuna's Medicare provider agreement and terminate the provider agreement before Niskayuna is afforded a fair opportunity to challenge the termination in an administrative proceeding and appeal, it will simply be too late for Niskayuna's business to recover.

## CONCLUSION

35. For all the foregoing reasons and those set forth in the accompanying memorandum of law, Niskayuna's application for a temporary restraining order and motion for a preliminary injunction should be granted.

                                                  _____
                                                        MATHEW VARGHESE

Sworn to before me on
October 25, 2010

_____
       Notary Public